# LENNON v. ST. LOUIS & SUBURBAN RAILWAY COMPANY, Appellant.

### Division Two, July 3, 1906.

1. **NEGLIGENCE: Perilous Position: Stepping on Track: Stopping Car: Vigilant Watch.** Plaintiff's wife had purchased some vegatables from a huckster's wagon which stood from three to five feet from the street railway track, in the middle of a block, and turning to leave the wagon took one or two steps towards the track and was struck by a car running eight miles an hour. There was no obstruction between the car and her, none between her and the track, the time was daylight, and she did not look for the car. Other cars had passed while persons were standing between the wagon and the track. It is admitted that if she had remained where she was before turning away from the wagon she would not have been struck by the car. *Held*, that she was not in such a perilous position as required the car to stop before reaching the huckster's wagon; and there being no showing that the car was not stopped in the shortest time possible after the danger was discovered or could have been discovered, the company is not liable.

2.  ——: ——: ——: ——: **Humanitarian Doctrine.** Where the adult pedestrian was not on the track, nor so close to it as to be in a perilous position until she suddenly stepped in front of the moving car only a few feet away, at a place where persons did not usually cross, namely, near the middle of a block, and the motorman did all he could to stop the car after her movement toward the track was begun, there is no room in the case for the humanitarian doctrine, and the company is not liable.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney,* Judge.

REVERSED.

*Jefferson Chandler, John Lionberger Davis* and *T. M. Pierce* for appellant.

(1) The court erred in refusing to give defendant's instruction in the nature of a demurrer to the pleadings and evidence, which was offered by defendant at the close of plaintiff's evidence, and again at the close of all the evidence in the case. Davies v. Railroad, 159 Mo. 1; Payne v. Railroad, 136 Mo. 581; Zumault v. Railroad, 175 Mo. 288; Ries v. Railroad, 179 Mo. 1; Petty v. Railroad, 179 Mo. 666; Reno v. Railroad, 180 Mo. 469. (2) The court erred in submitting the last chance or humanitarian doctrine by instructions given by the court itself and by plaintiff's instructions. Boyd v. Railroad, 105 Mo. 372; Petty v. Railroad, 179 Mo. 666; Reno v. Railroad, 180 Mo. 469; Rissler v. Railroad, 87 S. W. 578. (3) The court erred in instructing the jury that the motorman must keep a vigilant watch for people "likely to come into danger." This instruction was too broad and is not the law. Boyd v. Railroad, 105 Mo. 372; Petty v. Railroad, supra.

*A. R. Taylor* for respondent.

(1) The evidence makes a clear case for the jury's determination. Not only was there evidence in support

of the verdict but there was strong evidence of the negligence of appellant's motorman on appellant's evidence. For if he saw the deceased, as he says he saw her, so near the track as to endanger her life, and also saw that she did not heed his danger signals, as he says he did, then if he ran his car without abating his speed until the instant he struck her, as he admits — and as defendant's witness Killoren testifies —then he was negligent on the evidence given for defendant; certainly a fair-minded jury might with intelligence draw this inference. Klockenbrink v. Railroad, 172 Mo. 688; Scullin v. Railroad, 184 Mo. 707; Riska v. Railroad, 184 Mo. 192; Eckhard v. Railroad, 190 Mo. 618. (2) If the jury should believe from the evidence that she was standing engaged in bargaining for vegetables, where she must be struck by the car during all the time the car was running the 150 to 200 feet from Seventeenth street to the place of collision and in plain view of the motorman, and he did, nevertheless, run his car down upon her and kill her, then, under the general trend of judicial decision in this country, at least, the humane doctrine was properly applied. Inland Seaboard Co. v. Tolson, 139 U. S. 558; Railroad v. Ives, 144 U. S. 429; Keely v. Railroad, 75 Mo. 140; Kelly v. Railroad, 95 Mo. 284; Guenther v. Railroad, 95 Mo. 295; Kellny v. Railroad, 101 Mo. 75; Reardon v. Railroad, 114 Mo. 406; Schlereth v. Railroad, 115 Mo. 101; Chamberlain v. Railroad, 133 Mo. 599; Morgan v. Railroad, 159 Mo. 275; Klockenbrink v. Railroad, 172 Mo. 687; Scullin v. Railroad, 184 Mo. 707; Rapp v. Railroad, 190 Mo. 161.

GANTT, J.—The petition in this case in substance states that the defendant is and was at the times herein stated, a street railway company, under the laws of Missouri, operating street railway cars for the transportation of persons from one point to another in the city of St. Louis; that Wash street was one of the open pub-

lic streets of the said city; that the defendant operated its street cars on said Wash street; that plaintiff was the husband at the time of her death, of Mary Lennon herein mentioned; that on the 10th day of November, 1900, at or near a place on Wash street opposite house number 1621 Wash street, plaintiff's wife, the said Mary Lennon, was standing between a wagon on the south side of defendant's track and the defendant's track, engaged in buying vegetables from a huckster and in danger of being struck by defendant's east-bound car if it should pass her; that as the plaintiff's wife was passing from said position, the defendant's east-bound car struck and killed her. That plaintiff's wife was so struck and killed through the negligence and unskillfullness of the defendant's motorman and conductor in charge of said car, in this, that they failed to keep a vigilant watch ahead of their car, and failed to stop said car in time to prevent it from striking and killing plaintiff's wife, and in failing to give any signal by bell or otherwise to plaintiff's wife of the approach of said car and the danger therefrom; and for another assignment of negligence, plaintiff states that at the time of the said killing of his wife, there was within the city of St. Louis an ordinance of said city, by which it was provided that motormen and conductors of said cars should keep a vigilant watch for persons on foot, either on the track or moving towards it, and upon the first appearance of danger to such person, the car should be stopped in the shortest time and space possible, and the plaintiff avers that defendant's said motorman and conductor before and at the time of the killing of his wife, failed to keep such vigilant watch and failed to stop said car in the shortest time and space possible, which violation of said ordinance directly contributed to cause the death of his wife as aforesaid. That by the death of his wife caused as aforesaid an action accrued to the plaintiff to recover the sum of five thousand dollars, according to the statute in such cases, for which

he prayed judgment.

The answer of the defendant was, first, a general denial; second, that the injuries sustained by Mrs. Lennon were directly and proximately caused by her own thoughtlessness, carelessness and negligence, in this, that although she was then living and for a long time had lived on a street, where are laid double street car tracks, over which cars propelled by electricity constantly run in both directions, and knew that cars might be expected to pass that point at any moment, she carelessly and negligently attempted to cross the street and street car tracks immediately in front of the approaching car in the middle of the block where it is not usual or customary for persons to cross without looking or listening for approaching cars and thoughtlessly, suddenly, negligently and unexpectedly stepped in front of the approaching car, when if she had looked or listened or had used ordinary care she could have avoided being struck thereby. The reply was a general denial.

The evidence on behalf of the plaintiff established that Mrs. Mary Lennon was the wife of Lawrence Lennon, the plaintiff, and that she was killed by a street car of the defendant's street railway on November 10, 1900; that her home was with her husband and daughter at 1621 Wash street; that the defendant company owned and operated double tracks of its street railway on Wash street. Miss Mary Lennon, the daughter of the plaintiff, testified that it was not more than ten feet from the south rail of defendant's track to the curb on the south side of Wash street and that the defendant's cars projected about two feet outside of the rail. She testified that she had made no acutal measurements as to the projection of the street cars over the rail or the width of the street; that 1621 Wash street was about the middle of the block. She testified that she had two brothers under age at the time her mother was killed, one thirteen and the other nineteen.

Joseph Behan testified that he was a police officer

of the city of St. Louis, and saw the accident in which
Mrs. Lennon lost her life; he was standing across the
street on the north side; Mrs. Lennon was buying vege-
tables from a peddler whose wagon was standing be-
tween the south rail of the east-bound car track and the
curb, close to the curb; Mrs. Lennon was standing be-
tween the wagon and tracks; the track was from eight
to twelve feet from the curb there, I cannot state ex-
actly, I do not think it was over twelve feet, if it is that
much. "Q. How far was she from the rail of the track
when she was standing there talking to that man?"  A.
"Well, I should say that it would be a pretty close call
there for anybody— a car passing and anybody stand-
ing by the side of the wagon, there would not be much
room there." "I saw the car at the top of the hill on
Eighteenth street; I saw the car coming down the in-
cline from Eighteenth street down, the car was coming
down pretty fast, and there was some party on Seven-
teenth street put up his hand for the car to stop and it
kept on going, and the old lady stepped to the left and
as she did, it hit her, the fender did, and rolled her
about twenty-five or thirty feet and ran over her; the
car got stopped when she was in between the two trucks.
The front wheel had passed over her and she was in be-
teen the two trucks.  I never heard any signal or any-
thing — never heard no bell even ring.  The car was
coming at a pretty good clip.  I cannot tell how fast it
was coming, but it was coming pretty fast, faster than
an ordinary gait.  The motorman started to throw on
the brake or air-brake, I could not tell which it was, be-
fore it hit her.  I heard the racket as the woman step-
ped out.  I heard the thing twisting, I suppose it was
the brake." On cross-examination he stated that he had
been standing there some ten or fifteen minutes before
the car struck Mrs. Lennon, having a buggy repaired;
the huckster had been there about ten minutes on the
south side of the street, and he had noticed a lady pur-
chasing something from the huckster just before the ac-

cident and she had started down the street, and he first
noticed Mrs. Lennon when she was at the peddler's
wagon and when the huckster had finished waiting on
the first lady, he came around and was waiting on Mrs.
Lennon. While he was waiting on the first lady she
was standing between the front wheel and the hind
wheel on the north side of the wagon, she was facing
the wagon, and as she turned away from the huckster,
she turned to the northeast and just as she was step-
ping over the south rail, she had not made a second
step, she had only to make the one step, when she was
struck by the car. He did not give her any warning
because he did not think she was going to get struck un-
til the car hit her. Just before that she had been stand-
ing talking to the huckster; it looked to him as though
she was purchasing something from the huckster
though he did not notice whether the huckster had given
her anything or not.

Walter Gast testified that he was a passenger on
the rear platform of the car when it struck Mrs. Len-
non, and did not see her before she was killed; his at-
tention was called to the accident when the car made a
sudden stop, he had heard no bell ring, but he had paid
no attention to that; when he got off of the car he did
not notice the huckster wagon.

H. C. Montgomery testified that he had been in the
insurance business, but had been a motorman for the
suburban street railway and was acquainted with the
track of the Suburban from Eighteenth to Six-
teenth street; it was down grade. He was asked,
"Going at an ordinary rate of speed down that
grade — you are familiar with these cars?" He
answered, "Yes, sir." "Within what distance can
they stop?" and he answered, "It could be stop-
ped in about fifty feet with the brakes or in
about thirty feet with the reverse." On cross-examina-
tion, he stated that he knew nothing whatever about
the accident, did not know at what speed the car was

running, what kind of a car it was, how heavily loaded or any other of the conditions surrounding the accident. It would make some difference whether the car was heavily loaded or not; a car heavily loaded would take a little bit longer to stop, not a great deal; it would take a very large car a little longer to stop than an ordinary one. He had not worked for the Suburban since 1896, he had worked for the company from about the first of May until the 15th of June, he had not acted as a motorman on any other line since then, except to run a relief on the St. Charles & Southern, one night. His experience as a motorman was confined to a little over a month in 1896.

The plaintiff also offered in evidence the ordinance known as the Vigilant Watch ordinance, article six, chapter 1760, subdivision four of the ordinances of St. Louis, which provides: "The conductor, motorman, gripman, driver or any other person in charge of each car, shall keep a vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible."

With this evidence the plaintiff rested, and the defendant prayed the court to instruct the jury that plaintiff was not entitled to recover, which instruction was refused by the court and the defendant excepted.

The defendant on its part called the deputy clerk of the circuit court of the city of St. Louis and proved by him that the petition in this case was filed on the 10th day of May, 1901, at 1:16 p. m.

Mr. John Killoren, Jr., testified that he boarded the car that struck Mrs. Lennon at Seventeenth and Wash streets; that the car came to a full stop; that prior to getting on the car, he noticed a huckster wagon and several parties standing in the vicinity of it. The huckster wagon was about two hundred feet east of Seventeenth street, on the south side, right along the

side of the curb stone. After he got on the car, he stood on the rear platform. When the accident happended, he got off of the rear platform and the huckster wagon was about five or ten feet back of where the motorman stands. The horse was facing he thought towards the west; there was a space between the car and the wagon, he would judge, of about three or four feet; he passed between the wagon and the car when he went around to see Mrs. Lennon while she was under the car; her body was under the front truck. He described the stop of the car in this way: ''I heard the clanging of the front bell and the car came to a sudden stop, and kinda pushed me to the rear of the car, the body of the car; I was thrown forward.'' The car was running perhaps eight miles an hour before it stopped, the speed had increased until the power was suddenly shut off; the car was stopped.

Mr. C. B. Weisman testified that he was a passenger on the car and was seated three or four seats from the rear of the north side, and he noticed the motorman's face was as white as a sheet; he jumped off of the car, went around to the front, and found Mrs. Lennon under the trucks. The huckster wagon was on the south side of the street immediately next to the curbing and between the curb and the car about five or six feet from the car. It was towards the back end of the car. On cross-examination he stated that the car stopped in about twenty-three or twenty-four feet, he thought. He heard the gong ring two or three times after the car left Seventeenth street. Other witnesses testified to the sudden stopping of the car, and to the position of the wagon being abreast of the car when it stopped.

John Hartwig testified that he was the huckster in charge of the wagon mentioned in the evidence; that his wagon was right up against the curb stone; he had had several lady customers before Mrs. Lennon came; that she stood on the sidewalk at first on the south side of the street waiting her turn; when her turn

came, she asked him for some onions, and then bought some rutabagas. She was standing at the rear of his wagon when he gave her the rutabagas and when he gave her her change; that he then turned to the sidewalk and just as he started up on the curb, he heard the brake of the car. Saw the lady must get hurt; that he ran around and saw her under the car. He testified that the space between the car track and the wagon was about five feet. He stated that when he finished giving Mrs. Lennon her change he stepped briskly to the sidewalk, and just as he stepped on the sidewalk he heard the gong and turned around and rushed right back; he ran between his wagon and the car when he went to see what had become of Mrs. Lennon. The car track was about five feet from his wagon; there was nothing between Mrs. Lennon and the car when he turned his face to the curb; the sounding of the gong and the rattling of the brake were about the same time, he would judge; the car ran, after the brake was applied, about 25 feet; the car stopped opposite his wagon and he had to back up his horse to get out.

The motorman testified that he stopped his car at Seventeenth street, and that when he started the track to the east was clear; the huckster wagon was standing south of the tracks next to the curb with the horse to the east; as he approached the wagon, he rang his bell; he saw Mrs. Lennon at the back end of the wagon apparently getting her change. He had no idea of any danger until the car got within about 25 feet of Mrs. Lennon, who walked straight on the track and was struck before he could stop his car with the hand brakes and the reverse. He did all he could to stop the car the moment he saw Mrs. Lennon step towards the track; supposed she had heard the bell he had rung; she was in no danger until she stepped on to the track immediately in front of the car. She paid no attention, but walked right in front of the car; he made a good stop.

This was the evidence substantially.

I. It is conceded by the plaintiff and established by all eye-witnesses that Mrs. Lennon was not exercising ordinary care in watching and listening for a car when she stepped on the defendant's track. There can be no doubt whatever of the contributory negligence of Mrs. Lennon. All the testimony shows that the accident happened in broad daylight, and there was no obstruction whatever between Mrs. Lennon and the car which struck and killed her. But the contention of the plaintiff is that notwithstanding the negligence of Mrs. Lennon, the plaintiff is entitled to recover and the case was properly submitted to the jury on the theory that Mrs. Lennon in her position at the huckster wagon was in a position of imminent danger of being struck and the defendant's motorman operating said car saw, or by keeping a vigilant watch for persons in danger or likely to come into danger would have seen, her danger in time to have avoided striking and killing her, by stopping the car in the shortest time and space practical with the means and appliances at hand.

The real question in this case is, conceding all that the witness Behan testified to, notwithstanding he was contradicted by Hartwig, the huckster, and others, as to the position which Mrs. Lennon occupied, was she in such a place of peril as to require the motorman to have stopped his car before reaching the huckster's wagon? On this point the witnesses all agree Mrs. Lennon was standing close to the wagon for the purpose of buying some vegetables. They all agree the wagon was standing east and west and close to the curbstone. Plaintiff assumes as a substantial basis for his position, that the curb stone was only eight feet from the south rail of the south track of the defendant's railroad. The burden was on the plaintiff to show that the place was one of dangerous proximity to the track and when his witnesses stated, one, Miss Lennon, that it was about ten feet, and the other, Mr. Behan, that it was between eight and twelve feet, he was not certain, but "not over

twelve feet," we think there is no fair basis for his contention that it was only eight feet. Certainly we may assume it was not less than ten feet. Conceding that the car projected two feet over the rail, and that was mere surmise, there was still an eight-foot space for the wagon and Mrs. Lennon. Now there is not a scintilla of evidence as to the width of the wagon, and we are left to the uncertain recollection of the witnesses as to the space between the wagon and the south rail, but not one of them says Mrs. Lennon would have been struck had she remained still at the point where she bought and paid for her vegetables. Behan does say it would have been a pretty close call, he thinks, but he was on the opposite side of the street and all the disinterested passengers say that there was no trouble whatever to pass between the wagon and the car, and they did so after the accident. The evidence discloses other cars had passed that wagon just before this car and the huckster's customers were buying from him without any thought of danger. To hold that Mrs. Lennon was in a position of peril up to the time she started to recross the street after purchasing her vegetables would be a strained and unwarrantable conclusion from the evidence, and one which under the testimony we cannot accept as a predicate for our opinion. We think on the contrary the evidence establishes she was in a place of safety until she started across the track. What then were the relative positions of Mrs. Lennon and the motorman? It was broad daylight. The motorman is not charged with having run his car in excess of the ordinance, and had he been the record shows he was not running over eight miles an hour. He had come to a full stop not over two hundred feet west of the place of collision. Counsel for plaintiff concedes that the evidence preponderates that the motorman sounded his gong at Seventeenth street. As he came down to Sixteenth street he saw the huckster wagon and Mrs. Lennon, but she was an adult in a place of safety. She was

in or near the middle of the block where he would not expect people generally to be crossing the street. Seeing that Mrs. Lennon was an adult he had not the slightest reason to anticipate that, without looking or listening, she would suddenly start to cross the track in front of the approaching car. Until she did evince such a purpose there was nothing to call for the motorman to check his car or to sound his gong. When she heedlessly did start to cross without showing any knowledge of the approach of the car, the motorman sounded his gong or danger signals and reversed his car and stopped it so suddenly that it stood right by the huckster wagon after it was at a standstill.

In this case there is no presumption that Mrs. Lennon looked or listened before she started to cross the track. Counsel for plaintiff concedes that she was not exercising ordinary care for her own safety. This concession takes this case out of the class with Riska v. Railroad, 189 Mo. 183, and Eckhard v. Railroad, 190 Mo. 618. That the deceased was guilty of such contributory negligence as will prevent a recovery by her husband in the circumstances is conceded unless the case can be brought within the humanitarian doctrine or the Vigilant Watch ordinance of St. Louis. We think it falls within neither. Mrs. Lennon was not on the track nor in a place of peril and the motorman had the right to presume that an adult would not step immediately in front of his car. When she did suddenly and not over twenty-five feet therefrom step in front of the car, all the evidence concurs in showing that the motorman did all in his power to save the unfortunate lady. His car came to a full stop opposite the huckster's wagon. The motorman met the full requirement of the expert witness as to the time and space within which the car ought to be stopped and all the demands of the Vigilant Watch ordinance. We have maintained and will continue to maintain the right of trial by jury of contested facts, but this right at common law and in this State

has always been construed to mean that the verdict of the jury must be based upon substantial evidence. The learned circuit court, in our opinion, erred in submitting the case to the jury on the humane doctrine. The motorman neither saw nor by the exercise of due care could he have seen Mrs. Lennon on the track, for she was not there; neither could he have seen her in a position of peril until she suddenly placed herself there, and the evidence of physical facts shows that the motorman did all he could to avert the death of the unfortunate lady.

We think the evidence failed to show any negligence whatever on the part of the motorman, but did show a clear case of contributory negligence on the part of Mrs. Lennon, which bars any recovery by her husband, and that the judgment must be and is reversed.

*Burgess, P. J.,* and *Fox, J.,* concur.